## Gatto Estate. No. 2

*David S. Palkovitz*, for heirs of Julia Andros Gatto.
*Samuel Avins*, for heirs of Angelo Gatto.

Cox, J., February 27, 1950.—The first and final account of the First National Bank of McKeesport, administrator pendente lite, is before the court on audit in the estates of Julia Andros Gatto and Angelo Gatto, deceased, and the question to be determined is the manner in which distribution shall be made of the balance shown by the account.

From the record in this case it appears that both decedents died April 2, 1943, from gunshot wounds. The coroner's jury subsequently rendered a verdict that the wife was "Found dead at home Friday, April 2, 1943, at 4:30 p.m. from gunshot wound of head inflicted by one Angelo Gatto, who was also found dead at the above named place on same day and date at 4:30 p.m. And from the evidence the jury finds death was due to above cause and that the same was murder". The same coroner's jury also rendered a verdict that h> husband was "Found dead at home Friday, April 2, 1943, at 4:30 p.m. from self-inflicted wound of head.

And from the evidence the jury finds death was due to above cause and the same was suicide."

It also appears that a purported will alleged to have been signed by both Angelo Gatto and Julia Gatto, in the attestation clause, dated March 31, 1943, three days before the tragedy, was subsequently offered for probate, and that after taking testimony in a contest of the alleged will the register certified the matter to this court, in the meantime issuing letters of administration pendente lite to the First National Bank of McKeesport. The case was tried in this court, and in its opinion the court rejected the alleged will because it had not been signed at the end thereof as required by the Wills Act of 1917. In its decree, dated October 13, 1949, returning the record, the court directed the register to refuse probate of the instrument and to issue letters of administration to some fit person on the estates of these decedents. The administrator pendente lite then filed its account in the estates of these decedents.

At the audit of the account of the administrator pendente lite it appeared from statements of counsel that decedents owned real estate as tenants by entireties, that their furniture and some articles in a barber shop seemed also to have been so owned, that involved in the question of distribution are the proceeds of insurance policies, one on the life of Angelo Gatto in which Julia Gatto was named beneficiary, and another on the life of Julia Gatto, and that there were some government bonds in which decedents were coöwners.

The inventory filed by the administrator pendente lite in the estates of these decedents shows receipt of personal property consisting of the proceeds of a Metropolitan Life Insurance policy on the life of Julia Gatto in the amount of $1,002.48, of a Prudential Life Insurance policy on the life of Angelo Gatto in the

amount of $1,018.54, household goods and personal effects of the value of $816.73, and United States Treasury series E bonds in the amount of $1,907.50, the total amount of the personal property being $4,745.25, out of which were paid expenses of administration, fees, commissions, funeral expenses, and taxes in the total sum of $2,133.28, leaving a balance of personalty of $2,611.97.

Also included in the account of the administrator pendente lite, in addition to the balance of personalty of $2,611.97, is the rent from decedent's real estate for the period from May 20, 1944, to October 20, 1949, 65 months at $25 per month, or a total of $1,625, out of which sum were paid taxes, repairs, and insurance in the amount of $1,048.53, leaving the net balance of rents $576.47. These two amounts, personalty of $2,-611.97 and rent of $576.47, make up the balance now for distribution in the sum of $3,188.44.

The testimony and the record in the will contest was offered in evidence at the audit of the account without objection, and, therefore, it is part of the record on which we are to base our findings in the matter of distribution in this case.

Angelo Gatto, the husband, was survived by his father and mother, and also, as will appear later, by Julia Gatto, his wife. Julia Gatto, the wife, was survived by two brothers and two sisters.

Pete Andros, a brother of Julia Gatto, found the bodies of decedents in their home following their deaths. Before his induction into the Army he had lived with his sister and her husband. He testified generally as to how his brother-in-law treated his sister, his peculiar actions shortly prior to the deaths, and about the husband's worrying because he had to go to the Army. Pete Andros testified as follows:

"Q. Now you say you heard conversations between Angelo Gatto, your brother-in-law, and your sister his

wife. Do you remember any of those conversations particularly?

"A. Well, I remember once when he brought the subject about a will.

"Q. How many times, on how many occasions did you hear them discussing a will?

"A. Twice.

"Q. When was the first time?

"A. Oh, it was about five or six days before he murdered my sister; it was on a Sunday afternoon. . . .

"Q. And the last time was on a Wednesday night?

"A. That is right."

He testified the brother-in-law wanted his sister to sign a will with him giving everything to his parents and she refused. The witness said he had been making trips to the Presbyterian Hospital and having his feet treated by Dr. DeRoy, and that from one of these visits he had returned and gone to his sister's home. He testified as follows:

"Q. Who was the first to see the bodies of your sister and her husband?

"A. Well, I found them. When I found them I went up to the doctor's office.

"Q. Why did you go to the doctor's office?

"A. Well, as soon as I got there I sort of made a little investigation to see what happened, and then I felt Angelo first, and I knew he was dead because he was stiff and his hands were cold, and his face; and then I touched my sister's feet; they was sticking out of the covers; and I touched her hands, and they felt warm, and even the muscles in her foot felt flabby, so I thought maybe she was still alive, because she was warm. When I found that out I ran up to the doctor's office."

He said he entered the house through the cellar because the other doors were closed. He testified further.

"Q. Was her body found in the room she had been sleeping in?

"A. She must have slept there that night, but it was not found in her bedroom. She usually slept upstairs, and she was found down there in the dining room, on the studio couch.

"Q. What did you notice when you first came into the house, when you walked into that room?

"A. The first thing I noticed was Angelo lying on the couch.

"Q. Did that indicate to you there was anything wrong?

"A. No, I didn't think there was anything wrong, so I was ready to go back in the kitchen, and I noticed there was blood on the side of his head; I thought maybe he had a pealed ear or something, and it started bleeding, so right then and there I thought something happened, so I went over and found out."

This is the only testimony concerning the finding of the bodies, and it is not contradicted.

There is uncontradicted testimony that Angelo wanted his wife to join with him in a will giving everything to a nephew of his or his parents, and she refused to do it; that within a short time before the deaths Angelo in the morning hours twice had all the lights on in the house and was sitting staring at his wife, who had been asleep; that his health was not altogether good; that he had been examined once for the Army and would have been finally drafted into the service within a matter of days following the date of the tragedy. There is also in the papers of the case an affidavit from a doctor who knew Angelo and had been consulted by him, and this affidavit is to the effect that Angelo had definite hypochondriac and neurotic tendencies. The affidavit is dated the day after Angelo's death and also sets forth that his mental symptoms in

the six weeks prior thereto had been greatly magnified and he underwent a complete personality change probably brought about by worry, and that no amount of reasoning or persuasion seemed to bring him out of this insane depression. The doctor was of the opinion that Angelo suffered from dementia præcox of the paranoid type, which had been precipitated by undue worry upon a mind which under normal conditions had shown the hypochondriac and neurotic tendencies. This testimony well supports the finding of the coroner's jury that Angelo Gatto killed his wife and then committed suicide.

These decedents having died April 2, 1943, the statutory law applicable to rights of inheritance in a case where one person should kill another is found in the Act of August 5, 1941, P. L. 816, referred to as the Slayer's Act. The pertinent provisions of the act so far as this case is concerned are as follows:

"An Act regulating and limiting the rights of slayers in real and personal property and in the benefits from insurance policies arising out of or as a result of the death of the person slain; protecting and saving the rights of purchasers and insurers dealing with slayers without notice of the slaying, and repealing certain legislation.

"The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

"Section 1. As used in this act—

"(1) The term 'slayer' shall mean any person who participates, either as a principal or as an accessory before the fact, in the wilful and unlawful killing of any other person.

"(2) The term 'decedent' shall mean any person whose life is so taken.

"(3) The term 'property' shall include any real and personal property and any right or interest therein.

"Section 2. No slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in the sections following:

"Section 3. The slayer shall be deemed to have pre-deceased the decedent as to property which would have passed from the decedent or his estate to the slayer under the statutes of descent and distribution or have been acquired by dower, by curtesy or by statutory right as surviving spouse. . . .

"Section 5. One-half of any property held by the slayer and the decedent as tenants by the entirety shall pass upon the death of the decedent to his estate, and the other half shall be held by the slayer during his life, subject to pass upon his death to the estate of the decedent.

"Section 6. (a) One-half of any property held by the slayer and the decedent as joint tenants, joint owners or joint obligees shall pass upon the death of the decedent to his estate, and the other half shall pass to his estate upon the death of the slayer, unless the slayer obtains a separation or severance of the property or a decree granting partition. . . .

"Section 8. Any interest in property, whether vested or not, held by the slayer, subject to be divested, diminished in any way or extinguished, if the decedent survives him or lives to a certain age, shall be held by the slayer during his lifetime or until the decedent would have reached such age, but shall then pass as if the decedent had died immediately thereafter. . . .

"Section 11. (a) Insurance proceeds payable to the slayer as the beneficiary or assignee of any policy or certificate of insurance on the life of the decedent, or as the survivor of a joint life policy, shall be paid to the estate of the decedent, unless the policy or certificate designates some person not claiming through the slayer as alternative beneficiary to him.

"(b) If the decedent is beneficiary or assignee of any policy or certificate of insurance on the life of the slayer, the proceeds shall be paid to the estate of the decedent upon the death of the slayer, unless the policy names some person other than the slayer or his estate as alternative beneficiary, or unless the slayer by naming a new beneficiary or assigning the policy performs an act which would have deprived the decedent of his interest in the policy if he had been living. . . .

"Section 14. The record of his conviction of having participated in the wilful and unlawful killing of the decedent shall be admissible in evidence against a claimant of property in any civil action arising under this act.

"Section 15. This act shall not be considered penal in nature, but shall be construed broadly in order to effect the policy of this State that no person shall be allowed to profit by his own wrong, wherever committed."

In our search of authorities we have been unable to find any in which the provisions of the Slayer's Act have been construed where the facts were identical with those in the case before us. The parties who are claiming the balance for distribution in this estate are the two sisters and two brothers of Julia Gatto on the one side, and the father and mother of Angelo Gatto on the other. Probate having been refused to the purported will hereinbefore referred to, the balance is distributable under the provisions of the Intestate Act of 1917.

After careful study of the provisions of the Slayer's Act we are of the opinion that it was designed to prevent a slayer from acquiring any property or benefit which might result from the death of the person slain. The provisions of the act seem to contemplate the survival of the murderer, because it says he shall be deemed to have predeceased decedent as to property which would have passed to the slayer under the stat-

utes of descent and distribution or would have been acquired by dower, by curtesy or statutory right as surviving spouse. This view of the act is strongly supported by its other provisions as to property held by the slayer and decedent as tenants by the entirety, joint tenants, joint owners, or joint obligees, that only half thereof shall pass to the estate of decedent at his death, the other half remaining the property of the slayer until his death, when it shall pass to the estate of decedent. And, if anything further were needed to make it plain that the Slayer's Act contemplates survival of the slayer, it will be noted that any interest in property which the slayer holds (in this case, as tenant by the entirety, joint tenant, joint owner, etc.), which would be divested, diminished, or extinguished if decedent survives or lives to a certain age, shall be held by the slayer during his lifetime or until decedent would have reached such age, and only then pass as if decedent had died immediately after the slayer.

In the matter of insurance, according to the Slayer's Act, where the slayer is the beneficiary of a policy on the life of decedent the proceeds are to be paid to the estate of decedent, but if the decedent is beneficiary of a policy on the life of the slayer the proceeds are not to be paid to the estate of decedent until the death of the slayer.

All of the provisions of the Slayer's Act, in our opinion, thus seem to support without any question the view that in enacting this legislation the aim was to cover any case in which one person should kill another and survive the slain, and that there was no thought in the minds of the framers of the act that one person might accomplish the death of another and still die before his victim. If this be true, then the provisions of the Slayer's Act are not applicable to the case at bar, for the reason that the uncontradicted testimony shows

that the slayer himself died before the person whom he slew. The deaths in this case unquestionably occurred very close to the same time, but we have the testimony of Pete Andros that the body of the wife was still warm and the muscles of her feet were flabby, and the body of the husband was cold and stiff. This testimony is not contradicted by anything in the case, and we see no reason why it should not be accepted as true, thus establishing the fact that the slayer died first, and that his wife, having survived him, inherited everything held by them jointly or as tenants by the entirety, on her death the property becoming part of her estate. This also applies to the proceeds of both insurance policies hereinbefore referred to.

In summing up this case, therefore, it appears to us that the provisions of the Slayer's Act have no application in making our determination, and, since we are satisfied from the evidence that Angelo Gatto, the husband, died first, and his wife, Julia Gatto, survived, we would in regular course order that distribution be made to the administrator of the estate of Julia Gatto, deceased. In this case, however, the First National Bank of McKeesport, which has been administrator pendente lite throughout these proceedings, was appointed administrator of the estate of Julia Gatto, deceased, November 28, 1949, and letters of administration issued to it. In the regular course of procedure the decree of distribution on the account of the administrator pendente lite would be to the administrator of the estate of Julia Gatto, which is one and the same fiduciary in both capacities, so that such a decree would entail merely distribution from itself as administrator pendente lite to itself as administrator. The administrator would then file another account, which would be the same in all details as the account now before the court, excepting additional costs and additional fees and compensation for the extra work. These decedents died in April

1943, almost seven years ago. The disposition of this case has been delayed a long time. No question of creditors is involved, nor any rights of third parties. About 50 percent of the personal property and rents from real estate has already been consumed in the payment of expenses of administration, counsel fees, taxes, and so forth. We think, therefore, in the interest of time and economy under the circumstances of this case that nothing would be gained or lost by directing that the present account of the First National Bank of McKeesport, administrator pendente lite, shall be treated as its first and final account as administrator of the estate of Julia Gatto, deceased, and so forming our decree as to direct payment of the balance directly to the heirs of Julia Gatto.